NAMS Holdings, LLC v. Reece, 2018 NCBC 32.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 12288

NAMS HOLDINGS, LLC, a Delaware
Limited Liability Company,

Plaintiff,

v.

GRANT C. REECE; JAMES B.
CHAPMAN; and SMART
PROCESSING, LLC, a North
Carolina Limited Liability Company,

Defendants.

**ORDER AND OPINION
ON MOTION TO DISMISS
COUNTERCLAIMS**

1.      Plaintiff NAMS Holdings, LLC ("NAMS") acquired the payment-processing business of Defendants Grant C. Reece and James B. Chapman in 2014.  As part of the deal, Reece and Chapman became members of NAMS.  They agreed, among other things, to present new business opportunities to NAMS and not to solicit its customers and clients for a term of five years.  NAMS now contends that Reece, Chapman, and Reece's new company, Smart Processing, LLC (collectively, "Defendants"), violated these obligations.

2.      In response, Defendants deny any wrongdoing and assert counterclaims for indemnification and the advancement of legal fees and expenses incurred in defending this lawsuit.  Defendants base their claims on language in NAMS's operating agreement, which requires NAMS to indemnify any person for losses incurred "by reason of the fact" that the person is a member of the company.  Because

Reece and Chapman are members of NAMS, Defendants contend they are entitled to indemnification and advancement.

3. NAMS moves to dismiss the counterclaims pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. Having considered the motion, the briefs supporting and opposing the motion, and the parties' arguments at the hearing on January 25, 2018, the Court **GRANTS in part** and **DENIES in part** the motion to dismiss.

> *Robinson, Bradshaw & Hinson, P.A., by Adam K. Doerr and Charles H. Bowyer, for Plaintiff.*

> *Alexander Ricks, PLLC, by Alice C. Richey and Lucas D. Garber, for Defendants.*

Conrad, Judge.

I.
BACKGROUND

4. Reece and Chapman are the former owners of a payment-processing business known as North American Merchant Services, Inc. In 2014, they sold the business to NAMS, a Delaware limited liability company.

5. To effectuate the sale, the parties executed two agreements. (*See* Answer to Am. Compl & Am. Countercl. ¶ 7, ECF No. 43 ["Countercl."].) The first is NAMS's operating agreement ("LLC Agreement"), which governs its organization and operation. (ECF No. 17.2 ["LLC Agreement"].) The LLC Agreement divides the company's membership into two classes. ANARAQ NAMS Holdings LLC became the sole Class A member. (*See* LLC Agreement Ex. A.) Reece and Chapman became, and remain, Class B members. (*See* Countercl. ¶¶ 7–9; LLC Agreement Ex. A.) As Class

B members, Reece and Chapman do not have managerial authority and may not take actions on behalf of NAMS.  (*See* LLC Agreement §§ 5.1, 6.1.)

6.     The second agreement, a Securities Purchase Agreement ("SPA"), details the terms of the sale.  (ECF No. 36.3 ["SPA"].)  NAMS acquired all outstanding interests in the payment-processing business, and in return, Reece and Chapman received cash payments and their Class B membership interests in NAMS.  (*See* SPA §§ 2.1, 2.2.)  Reece and Chapman also agreed to a number of restrictive covenants, including an agreement not to solicit NAMS's "merchant customer[s]" and "merchant client[s]" for a period of five years.  (SPA § 9.3(b), (c).)  In addition, Reece and Chapman "shall have the duty to communicate or present" certain business opportunities to NAMS in the event either "acquires knowledge" of the opportunity "while . . . hold[ing] Class B Units."  (SPA § 9.5.)

7.     NAMS contends that Defendants breached these obligations.  In its original complaint, NAMS alleged that it sold most or all of its assets to CMS Processing, LLC ("Clarus") in late 2016.  (Compl. ¶ 14, ECF No. 3.)  A few months later, Clarus informed NAMS that Defendants had successfully persuaded a number of merchants to stop doing business with Clarus and instead to use the services of Smart Processing.  (*See* Compl. ¶ 17.)  NAMS immediately filed this action, claiming that Defendants breached section 9.3 of the SPA and parallel non-solicitation provisions in the LLC Agreement.  (Compl. ¶¶ 19–21, 25.)  NAMS also moved for a preliminary injunction, which the Court denied.  (ECF No. 29.)

8.  NAMS amended its complaint on September 25, 2017, adding new allegations and revising its claims. The amendments omit any claim for breach of the LLC Agreement but introduce new allegations that Reece and Chapman breached section 9.5 of the SPA by diverting business opportunities to themselves. (*See* Am. Compl. ¶¶ 69–72, ECF No. 36.) NAMS seeks indemnification for the breaches and a declaratory judgment that Reece and Chapman, as Class B members, are subject to section 9.5. (*See* Am. Compl. ¶¶ 118–26, 134–38.)

9.  The amendments also introduce a claim for tortious interference with contract. NAMS alleges that Reece and Chapman, "[a]s Class B Members of NAMS," were "apprised of" the transactions with Clarus. (*See* Am. Compl. ¶ 129; LLC Agreement § 8.4.) It further alleges that Defendants interfered with the agreements between NAMS and Clarus by intentionally soliciting and converting merchants, causing NAMS to breach the agreements. (*See* Am. Compl. ¶¶ 130–33.)

10.  Defendants timely answered and filed counterclaims for indemnification and advancement. (*See* Countercl. ¶¶ 19, 23–37.) The counterclaims are based on section 5.4 of the LLC Agreement, which states that NAMS must indemnify any person "against any losses, liabilities, damages and expenses . . . incurred or suffered by" the person "by reason of the fact that" he "is or was a Member" of NAMS. (LLC Agreement § 5.4(a).) It also states that NAMS must "pay the expenses incurred by any [person] indemnifiable hereunder, as such expenses are incurred, in connection with any proceeding in advance of the final disposition . . . ." (LLC Agreement § 5.4(a).)

11.    According to Defendants, each of NAMS's claims is based, at least in part, on Reece and Chapman's status as Class B members.  (*See* Countercl. ¶ 27.)  This, Defendants contend, entitles them to indemnification as well as advancement of the legal fees and expenses incurred in defending this lawsuit.  (*See* Countercl. ¶¶ 28, 35.)

12.    NAMS moved to dismiss the counterclaims on November 27, 2017.  (ECF No. 48.)  The motion has been fully briefed, and the Court held a hearing on January 25, 2018, at which counsel for all parties appeared.  The motion is ripe for determination.

## II.
## LEGAL STANDARD

13.    A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency" of the claims for relief.  *Concrete Serv. Corp. v. Inv'rs Grp., Inc.* 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).  The motion should be granted only (1) when the defendant's pleading on its face reveals that no law supports the counterclaim; (2) when the pleading on its face reveals the absence of a fact sufficient to make a good claim; or (3) when some fact disclosed in the pleading necessarily defeats the counterclaim.  *See Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986).

14.    In deciding a Rule 12(b)(6) motion, the Court must treat the well-pleaded allegations of the counterclaims as true and view the facts and permissible inferences "in the light most favorable to" the non-moving party.  *Ford v. Peaches Entm't Corp.*, 83 N.C App. 155, 156, 349 S.E.2d 82, 83 (1986); *see also Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970).  "[T]he court is not required to accept as true any

conclusions of law or unwarranted deductions of fact." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001).

15.    The Court "may properly consider documents which are the subject of" the defendant's pleading without converting a Rule 12(b)(6) motion into one for summary judgment. *Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App 198, 204, 652 S.E.2d 701, 707 (2007).

### III.
### ANALYSIS

16.    Defendants ground their counterclaims for indemnification and advancement in section 5.4(a) of the LLC Agreement. NAMS contends that section 5.4(a), by its terms, does not apply to the claims in the amended complaint. This dispute requires the Court to interpret the operating agreement of NAMS, a Delaware limited liability company. Thus, Delaware law governs. *See, e.g.*, *Meyers v. Quiz-DIA LLC*, 2017 Del. Ch. LEXIS 96, at *10–11 (Del. Ch. June 6, 2017); *Cable Tel Servs. v. Overland Contr.*, 154 N.C. App. 639, 642, 574 S.E.2d 31, 33 (2002) (noting that North Carolina courts generally apply "[t]he law of the state chosen by the parties to govern their contractual rights and duties").

### A. "By Reason of the Fact"

17.    Under Delaware law, limited liability companies have "broad authority to provide for indemnification" of their members and managers "by contract in their operating agreements." *Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Holding Co. LLC*, 853 A.2d 124, 127 (Del. Ch. 2004); *see also* Del. Code Ann. tit. 6, § 18-108. "The scope of a party's right to indemnification under an operating

agreement is therefore governed by contractual principles." *Meyers*, 2017 Del. Ch. LEXIS 96, at *11. When interpreting the agreement, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

18. Here, the LLC Agreement requires NAMS to indemnify any person "to the fullest extent permitted under" Delaware law if that person incurs losses "by reason of the fact that" he "is or was a Member" of the company. (LLC Agreement § 5.4(a).) The key phrase—"by reason of the fact"—is imported from the Delaware statute governing indemnification of corporate directors and officers. *See* Del. Code Ann. tit. 8, § 145(a)–(b). This use of statutory language has interpretive significance, suggesting an intent to absorb the substantial body of precedent construing and applying section 145. In analogous cases, Delaware courts have held that "case law interpreting that statutory provision bears on" the construction of the phrase "by reason of the fact" as used in an LLC's operating agreement. *Costantini v. Swiss Farm Stores Acquisition LLC*, 2013 Del. Ch. LEXIS 296, at *11 (Del. Ch. Dec. 5, 2013); *see also Meyers*, 2017 Del. Ch. LEXIS 96, at *14. The Court agrees and follows the lead of the Delaware courts in looking to this case law to interpret section 5.4(a) of the LLC Agreement.

19. In the corporate context, Delaware courts have construed the "by reason of the fact" requirement broadly but not "so broadly as to encompass every suit brought against an officer or director." *Weaver v. ZeniMax Media, Inc.*, 2004 Del. Ch. LEXIS 10, at *9–10 (Del. Ch. Jan. 30, 2004). Rather, there must be "a nexus or causal

connection between any of the underlying proceedings . . . and one's official corporate capacity." *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 215 (Del. 2005). Mere "but for" causation is insufficient; the corporate powers must be "use[ful] or necessary for the commission of the alleged conduct" upon which the claim is based. *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 406 (Del. Ch. 2009) (quoting *Bernstein v. TractManager, Inc.*, 953 A.2d 1003, 1011 (Del. Ch. 2007)). Thus, "the key inquiry is whether the claim depends on a showing that the official breached duties, quintessentially fiduciary duties, he owed to the corporation in that capacity or faces liability from a third party due to actions taken in his official capacity." *Zaman v. Amedeo Holdings, Inc.*, 2008 Del. Ch. LEXIS 60, at *55 (Del. Ch. May 23, 2008).

20. In some circumstances, the causal connection is clear. A breach of fiduciary duty that arises out of an individual's "status as a corporate officer" satisfies the statutory requirement. *Perconti v. Thornton Oil Corp.*, 2002 Del. Ch. LEXIS 51, at *16 & n.23 (Del. Ch. May 3, 2002). Likewise, the causal nexus exists when the individual "us[es] inside information which he possessed by virtue of his corporate status" to carry out the alleged wrongful conduct. *Id.* at *19; *see also Brown v. LiveOps, Inc.*, 903 A.2d 324, 328, 330 (Del. Ch. 2006) (denying motion to dismiss indemnification for copyright infringement and trade-secret misappropriation claims where former officer "gained access to the company's source codes while he was a corporate official at the company").

21. By contrast, Delaware courts are hesitant to require indemnification for claims that an officer "breached his individual obligations" to the company. *Cochran*

*v. Stifel Fin. Corp.*, 2000 Del. Ch. LEXIS 179, at *20–21 (Del. Ch. Dec. 13, 2000), *aff'd in relevant part*, 809 A.2d 555 (Del. 2002). Thus, "claims brought by a corporation against an officer for excessive compensation paid or breaches of a non-competition agreement are 'quintessential examples of a dispute between an employer . . . and an employee.'" *Weaver*, 2004 Del. Ch. LEXIS 10, at *10 (quoting *Cochran*, 2000 Del. Ch. LEXIS 179, at *19). Such claims "are not brought 'by reason of the fact' of the" person's official capacity. *Id.*; *see also Charney v. Am. Apparel, Inc.*, 2015 Del. Ch. LEXIS 238, at *48–51 (Del. Ch. Sept. 11, 2015).

### B. Indemnification

22. This case law informs the Court's interpretation of section 5.4(a) of the LLC Agreement. In short, for section 5.4(a) to apply, there must be a causal connection between the claims in the amended complaint and Reece and Chapman's status as members of the company. Put another way, the question is whether NAMS's claims implicate Reece and Chapman's official status or instead turn on "a specific and personal contractual obligation." *Paolino*, 985 A.2d at 403.

23. To make this determination, the Court must "examin[e] the pleadings." *Charney*, 2015 Del. Ch. LEXIS 238, at *48 (quoting *Holley v. Nipro Diagnostics, Inc.*, 2014 Del. Ch. LEXIS 268, at *23 (Del. Ch. Dec. 23, 2014)). "The Court must seek to discern the nature of the claims which [Defendants are] called upon to defend by reading the [amended complaint] as a whole and providing a reasonable interpretation of the substance of the allegations of each count." *Weaver*, 2004 Del. Ch. LEXIS 10, at *14.

1. Business Opportunities

24.     NAMS's first, second, and fourth claims all relate to Reece and Chapman's duties under the SPA, specifically the requirement not to solicit NAMS's merchant clients (section 9.3) and the obligation to present business opportunities to NAMS (section 9.5).  (*See* Am. Compl. ¶¶ 48–65, 69–72, 119–22.)  NAMS alleges that Reece and Chapman breached both provisions, seeks indemnification for the alleged breaches, and requests a declaratory judgment that section 9.5 "is operative and applicable to Reece and Chapman."  (Am. Compl. ¶¶ 124–26, 135–38.)

25.     Notably, Defendants put section 9.3 to the side.  Their counterclaim does not appear to seek indemnification for the alleged breach of the non-solicitation restrictions, and their opposition brief omits any discussion of section 9.3.  (*See* Countercl. ¶¶ 20, 23–28; Defs.' Br. Opp'n to Pl.'s Mot. to Dismiss Defs.' Countercl. 8–9, 11–16, ECF No. 52 ["Opp'n"].)  Accordingly, the Court need not address whether there is a causal connection between the claim for breach of section 9.3 and Reece and Chapman's status as members of NAMS.

26.     Section 9.5 is a different matter.  NAMS argues that section 9.5 imposes personal obligations under the SPA, thus bearing no causal relation to Reece and Chapman's status as members.  (*See* Pl.'s Br. Supp. Mot. to Dismiss Defs.' Countercl. 7–9, ECF No. 49 ["Pl.'s Br."]; Pl.'s Reply Br. Supp. Mot. to Dismiss Defs.' Countercl. 8–12, ECF No. 60 ["Reply"].)  Defendants, on the other hand, read this section to impose a duty "owed to NAMS . . . by Reece and Chapman as Members of the LLC."  (Opp'n 8; *see also* Opp'n 12.)

27. At first blush, the language of section 9.5 appears to support Defendants. It states that Reece and Chapman "shall have the duty to communicate or present" business opportunities "while [each] holds Class B Units." (SPA § 9.5.) The amended complaint likewise alleges that "Section 9.5 . . . unequivocally requires Reece and Chapman, *for so long as they hold Class B Units*, to present NAMS . . . with all 'Corporate Opportunities.'" (Am. Compl. ¶ 69 (emphasis added); *see also* Am. Compl. ¶ 138.) According to Defendants, "any duty arising under Section 9.5 . . . springs from" Reece and Chapman's membership status, which must be "determined by reference to the LLC Agreement," and NAMS's claims based on section 9.5 therefore arise "by reason of the fact" that Reece and Chapman are members. (Opp'n 12; *see also* Opp'n 16.)

28. Having carefully considered the pleadings and the underlying agreements, the Court disagrees. Reece and Chapman's duty to present business opportunities to NAMS cannot arise from their membership status because the LLC Agreement expressly waives that duty for members. In section 5.3(b), NAMS and its members "waive any fiduciary or other duty of the Members and the Manager, including, without limitation, fiduciary or other duties that may be related to or associated with self-dealing, *corporate opportunities* or otherwise, so long as such Person acts in a manner consistent with this Agreement." (LLC Agreement § 5.3(b) (emphasis added).)

29. As a result, the source of Reece and Chapman's duty to present corporate opportunities lies elsewhere—in the SPA itself. As NAMS correctly observes, the

SPA is a separate agreement and one that Reece and Chapman negotiated and executed in their personal capacities, "not as members of the LLC." (Reply 2.) Section 9.5 does not impose a blanket duty on members. It treats Reece and Chapman as individuals, imposing a duty to present corporate opportunities but exempting "any business opportunity" that Reece and Chapman are "obligated to share with" their employers. (SPA § 9.5.) This limited duty is better viewed as a condition of the sale of their business, rather than a condition of membership. It is therefore a personal obligation, not one that arises out of their status as members of NAMS.

30. The fact that section 9.5 refers to Reece and Chapman's membership interests does not mean that the duty arises out of their status as members. The LLC Agreement's waiver of the very same duty makes this clear. Rather, the reference to membership is a timing limitation—that is, the personal duty imposed by the SPA exists only for so long as Reece and Chapman hold Class B units. (*See* Reply 7.)

31. Defendants insist that this is sleight of hand. They contend that NAMS amended its complaint to remove crucial references to the LLC Agreement, assert claims only under the SPA, and thereby evade its indemnification obligations. (*See* Opp'n 10–11.) According to Defendants, Delaware courts reject "pleading formalism" of this type and look to the underlying nature of the pending claims. (Opp'n 10 (quoting *Reddy v. Elec. Data Sys. Corp.*, 2002 Del. Ch. LEXIS 69, at *19–20 (Del. Ch. June 18, 2002)).)

32. But the Court's conclusion is not a product of artful pleading; it is instead driven by the structure of the arms-length agreements the parties freely executed.

Delaware law stresses the importance of contract in the LLC context. *See Fillip v. Centerstone Linen Servs., LLC*, 2013 Del. Ch. LEXIS 294, at \*14 (Del. Ch. Dec. 3, 2013); *see also* Del. Code Ann. tit. 6, § 18-1101(b) ("It is the policy of [the Limited Liability Company Act] to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."). Parties are free to organize an LLC as they wish, including contracting to impose or forgo fiduciary duties. *See Kelly v. Blum*, 2010 Del. Ch. LEXIS 31, at \*41–42 & n.67 (Del. Ch. Feb. 24, 2010) (citing Del. Code Ann. tit. 6, § 18-1101(c)).

33. The parties could have imposed a duty to present business opportunities as a condition of membership in NAMS. *See, e.g.*, *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del. 1996) (noting that, in the corporate context, the obligation not to usurp corporate opportunities is "one species of the broad fiduciary duties assumed by a corporate director or officer"). Instead, the parties agreed that members owe no fiduciary duty to present corporate opportunities to NAMS but that Reece and Chapman owe a limited duty as part of the sale of the company. They also bargained for an indemnification provision specific to the SPA, which does not require NAMS to indemnify Reece and Chapman for their own breaches of its terms. (*See* SPA § 10.2.) These decisions were reasonable and fully permitted by Delaware law. *See* Del. Code Ann. tit. 6, § 18-108; *see also Meyers*, 2017 Del. Ch. LEXIS 96, at \*11; *Fillip*, 2013 Del. Ch. LEXIS 294, at \*14, 16; *Senior Tour Players 207 Mgmt. Co.*, 853 A.2d at 127.

34. The result is that NAMS may sue Reece and Chapman, who happen to be members, for their acts under the SPA without triggering the indemnification

obligations imposed by the LLC Agreement. *See Bernstein*, 953 A.2d at 1016–17. To hold otherwise would upset this carefully crafted bargain, contrary to the Court's role "to effectuate the parties' intent." *Lorillard Tobacco*, 903 A.2d at 739.

35. The analysis in *Reddy* is therefore irrelevant. All of the claims in that case, including contract claims, "could be seen as fiduciary allegations . . . that a senior managerial employee failed to live up to his duties of loyalty and care to the corporation" as he "perform[ed] his day-to-day managerial duties." *Reddy*, 2002 Del. Ch. LEXIS 69, at *20. By contrast, Reece and Chapman have no managerial duties as passive interest holders, and the LLC Agreement extinguishes any duties of loyalty they might otherwise have.

36. Likewise, the amendments made by NAMS to its complaint are beside the point. The allegations in the original complaint concerning breach of the LLC Agreement related to *non-solicitation*, not *corporate opportunities*. Furthermore, NAMS omitted those allegations from the amended complaint after it was noted that the LLC Agreement automatically terminated upon the sale of assets to Clarus and that the relevant provisions did not survive the termination. *See NAMS Holdings, LLC v. Reece*, 17 CVS 228 ¶ 13 (N.C. Super. Ct. Aug. 18, 2017). As such, the Court discerns no attempt, bad faith or not, on the part of NAMS to avoid its obligations under the LLC Agreement.

37. In conclusion, the language of the SPA and the LLC Agreement is unambiguous. The duty to present business opportunities to NAMS is one that is personal to Reece and Chapman, not a condition of their membership in NAMS.

Accordingly, the Court holds that NAMS's first, second, and fourth claims were not brought "by reason of the fact" that Reece and Chapman are members of NAMS, and section 5.4(a) of the LLC Agreement does not apply to these claims as a matter of law. To the extent Defendants' claim for indemnification relates to these three claims, it is dismissed with prejudice.

2. Tortious Interference with Contract

38. NAMS's third claim alleges that all Defendants tortiously interfered with the contracts between NAMS and Clarus. (*See* Am. Compl. ¶¶ 128–33.) NAMS alleges that "[a]s Class B Members of NAMS . . ., Reece and Chapman have received execution copies of the" agreements between NAMS and Clarus and therefore had "knowledge of and/or were apprised of [their] terms and conditions." (Am. Compl. ¶ 129.) It further alleges that Defendants' efforts to solicit and convert customers "have caused Clarus to allege breaches" of those agreements. (Am. Compl. ¶¶ 129, 132–33.)

39. NAMS contends that this claim is not brought by reason of the fact that Reece and Chapman are members of NAMS. (*See* Pl.'s Br. 5.) Defendants respond that the claim specifically alleges that Reece and Chapman gained knowledge of the agreements "through their status as Class B Members," and thus Reece, Chapman, and Smart Processing, as their affiliate, have stated a claim for indemnification. (Opp'n 14; *see also* LLC Agreement § 5.4(a).)

40. Defendants' argument is persuasive. Delaware courts have held that where a corporate official learns of confidential or proprietary information by virtue of his

official capacity and then uses that information to harm the company, claims arising out of that conduct are brought by reason of the individual's official capacity. *See Brown*, 903 A.2d at 329–30; *see also Holley*, 2014 Del. Ch. LEXIS 268, at *27; *Pontone v. Milso Indus. Corp.*, 100 A.3d 1023, 1051 (Del. Ch. 2014).

41.   The amended complaint alleges that Defendants acquired knowledge of the Clarus agreements by virtue of their membership in NAMS.  (*See* Am. Compl. ¶ 129.) Indeed, NAMS alleges no other means by which Defendants acquired this knowledge. Then, in full knowledge of the agreements, Defendants "knowingly, willfully, and intentionally interfered with" them by soliciting and converting merchant customers. (Am. Compl. ¶ 133.)  These allegations are sufficient to state a claim for relief.  *See Pontone*, 100 A.3d at 1051 (holding that claims, including claim for tortious interference, were brought by reason of defendants' official capacity where alleged wrongdoing was "facilitated by the confidential proprietary and trade secret information they acquired from serving as directors and officers").

42.   In its reply brief, NAMS does not directly address this connection between the knowledge Reece and Chapman acquired and their status as Class B members. Instead, NAMS argues that the claim against Reece and Chapman "could not have been made 'by reason of the fact that' they were members of the LLC because they have no authority to act" on NAMS's behalf as Class B members.  (Reply 6, 10–12.) This argument reads Delaware law too narrowly (and comes dangerously close to nullifying indemnification for NAMS's members altogether).  The use of confidential information acquired by virtue of one's official status is an act that establishes the

required causal connection between the alleged wrongdoing and the individual's official capacity. *See Brown*, 903 A.2d at 329–30; *see also Holley*, 2014 Del. Ch. LEXIS 268, at \*27; *Pontone*, 100 A.3d at 1051.

43. NAMS's other argument is that the claims arise out of personal obligations under the SPA. (*See* Pl.'s Br. 4–5, 10–12; Reply 2–5.) That is true as to NAMS's first, second, and fourth claims, but the claim for tortious interference does not arise under the SPA, and NAMS alleges no breach of any SPA provision in connection with this claim. Rather, Reece and Chapman acquired knowledge of the Clarus agreements under the LLC Agreement and by virtue of their membership in NAMS. Applying the LLC Agreement's indemnification provision to the claim for tortious interference would not interfere with any rights or obligations in the SPA and would not upset the parties' bargain.

44. The conclusion that Defendants have stated a claim for indemnification does not mean that they are necessarily entitled to indemnification. NAMS may demonstrate, through discovery, that Defendants' expenses are "attributable to" their own "fraud, willful misconduct or gross negligence," and therefore not indemnifiable. (LLC Agreement § 5.4(a).) But at this stage, taking the allegations in a light most favorable to Defendants, the Court concludes that Defendants have adequately alleged that the claim for tortious interference with contract was brought by reason of the fact that Reece and Chapman are members of NAMS. *See Holley*, 2014 Del. Ch. LEXIS 268, at \*27; *Pontone*, 100 A.3d at 1051; *Brown*, 903 A.2d at 329–30.

45. To the extent Defendants' counterclaim for indemnification is based on NAMS's claim for tortious interference with contract, the motion to dismiss is denied.

C. Advancement

46. Defendants also claim that they are entitled to advancement of their legal fees in defending NAMS's claims. Under Delaware law, indemnification and advancement are related but "distinct and different legal rights." *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 586–87 (Del. Ch. 2006) (citations omitted); *see also Senior Tour Players 207 Mgmt. Co.*, 853 A.2d at 128 (citation omitted). The right to advancement does not necessarily turn on whether, after the final disposition of a case, an individual will be entitled to indemnification. *See Majkowski*, 913 A.2d at 586 (citations omitted); *Senior Tour Players 207 Mgmt. Co.*, 853 A.2d at 128 (citation omitted).

47. Defendants' right to advancement, if any, is contractual. In the LLC context, "the Delaware Limited Liability Company Act confers upon contracting parties 'nearly unfettered contractual discretion in determining whether to grant advancement.'" *Grace v. Ashbridge LLC*, 2013 Del. Ch. LEXIS 315, at *13 (Del. Ch. Dec. 31, 2013) (quoting *Donohue v. Corning*, 949 A.2d 574, 578 (Del. Ch. 2008)). Delaware "courts have been equally clear . . . that Delaware's public policy favoring advancement does not trump basic principles of contract interpretation." *Fillip*, 2013 Del. Ch. LEXIS 294, at *16 (citing *Majkowski*, 913 A.2d at 593). Accordingly, the Court must interpret the LLC Agreement "like any other contract, ascertaining the

parties' intent from the plain meaning of the terms they chose." *Id.* at \*14 (citation omitted).

48.    The LLC Agreement's advancement provision states that NAMS "shall pay the expenses incurred by any [person] indemnifiable hereunder, as such expenses are incurred, in connection with any proceeding in advance of the final disposition, so long as [NAMS] receives an undertaking by such [person] to repay the full amount advanced" if that person is not ultimately entitled to indemnification.    (LLC Agreement § 5.4(a).)   The parties joust over the phrase "indemnifiable hereunder." Defendants maintain that, because indemnification and advancement are distinct legal rights, their right to advancement is not conditioned upon whether or not they are entitled to indemnification. (Opp'n 7.)  NAMS's position is that the plain language of the LLC Agreement conditions advancement on being indemnifiable.  (Pl.'s Br. 13; Reply 12–15.)   Accordingly, if Defendants are not indemnifiable as a matter of law, they are not entitled to advancement.  (Pl.'s Br. 13; Reply 14–15.)

49.    The Court agrees with NAMS.  Although indemnification and advancement are distinct legal rights, the parties expressly conditioned advancement on the possibility of being indemnified.  The plain meaning of "*indemnifiable* hereunder" requires that it be possible for a person to be indemnified under section 5.4(a) for that person's advancement rights to be triggered.  Thus, if Defendants are not entitled to indemnification as a matter of law, as NAMS suggests, they are not entitled to advancement.

50. The Court has determined as a matter of law that Defendants are not entitled to indemnification for their defense of NAMS's claims for breach of contract, indemnification, and declaratory judgment to the extent those claims concern the alleged breach of the corporate-opportunities provision. It would make little sense to construe the LLC Agreement's advancement provision to provide advancement for claims for which Defendants, as a matter of law, could not be indemnified. Delaware courts have likewise denied advancement as a matter of law in circumstances where a party was not sued by reason of the fact of their corporate status. *See, e.g, Charney*, 2015 Del. Ch. LEXIS 238, at \*47–56; *Bernstein*, 953 A.2d at 1016–17; *Weaver*, 2004 Del. Ch. LEXIS 10, at \*12–18. Accordingly, as a matter of law, Defendants are not entitled to advancement of their legal expenses in defending NAMS's first, second, and fourth claims for relief.

51. Defendants have, however, stated a claim for indemnification as to NAMS's claim for tortious interference with contract. As a result, Defendants have also stated a claim for advancement of their legal expenses incurred in defending the tortious interference claim. In the event it is ultimately determined that Defendants are not entitled to indemnification, they may be required to return the advanced fees. For now, the potential for indemnification supports the counterclaim for advancement. *See Holley*, 2014 Del. Ch. LEXIS 268, at \*38; *Majkowski*, 913 A.2d at 586.

52. The Court therefore denies the motion to dismiss the counterclaim for advancement to the extent it concerns the underlying tortious interference claim.

## IV.
## CONCLUSION

53. For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** the motion to dismiss.

a. The Court **GRANTS** the motion with respect to Defendants' counterclaims for indemnification and advancement as to NAMS's claims for breach of contract, indemnification, and declaratory judgment. To this extent, Defendants' counterclaims are **DISMISSED** with prejudice.

b. The Court **DENIES** the motion with respect to Defendants' counterclaims for indemnification and advancement as to NAMS's claim for tortious interference with contract.

This the 16th day of April, 2018.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases